1

2

3

4

5

6

7

8                                  UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ADAM SHARPE,                                No.  1:19-cv-00711-DAD-EPG (PC)

12                    Plaintiff,                  FINDINGS AND RECOMMENDATIONS
                                                  RECOMMENDING THAT DEFENDANTS'
13           v.                                   MOTION FOR SUMMARY JUDGMENT BE
                                                  DENIED
14    C. CRYER, et al.,

15                    Defendants.                 (ECF No. 65)

16                                                OBJECTIONS, IF ANY, DUE WITHIN
                                                  TWENTY-ONE DAYS
17

18

19    I.      INTRODUCTION

20            Plaintiff Adam Sharpe is a state prisoner proceeding *pro se* and *in forma pauperis* in this

21    civil rights action filed pursuant to 42 U.S.C. § 1983. This case proceeds on Plaintiff's remaining

22    claims from his complaint alleging that Defendants C. Cryer, J. Lewis, and S. Gates were

23    deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (*See*

24    ECF Nos. 1, 33, 66).

25            On May 24, 2021, Defendants filed a motion for summary judgment, arguing that,

26    because they were only involved in Plaintiff's appeals for medical care at the administrative level,

27    lacked medical training or the authority to obtain medical care for him, and never denied him

28    care, they could not be considered deliberately indifferent to his serious medical needs. (ECF No.

                                                    1

65). Defendants also argue that they are entitled to qualified immunity. (*Id.*). Plaintiff filed his opposition on June 21, 2021, and Defendants filed their reply on June 25, 2021. (ECF Nos. 67, 68).

For the reasons given below, the Court recommends denying Defendants' motion for summary judgment.

## II.    BACKGROUND

### A.    The Complaint

In relevant part, Plaintiff's complaint alleges that he suffers from keratoconus, an eye disease that deteriorates his vision. (ECF No. 1, p. 3). Accordingly, he has been prescribed SynergEyes Hybrid Contact Lenses. (*Id.*). Without the contact lenses, Plaintiff's natural vision is 20/200 in the left eye and 20/400 in the right eye. (*Id.*). The lenses are to be replaced every 6 months. (*Id.*). Plaintiff received lenses on October 4, 2016, at Kern Valley State Prison. (*Id.*). Plaintiff then transferred to Substance Abuse Treatment Facility (SATF) in December of 2016. (*Id.*). Plaintiff let SATF medical know that Plaintiff's lenses would need to be replaced. (*Id.*).

On April 27, 2017, Plaintiff was told he would be referred to see an ophthalmologist. (*Id.*). Plaintiff did not see an ophthalmologist, so he filed a healthcare appeal (SATF HC-17065076) concerning his need for vision care. (*Id.* at 3-4). Plaintiff saw an ophthalmologist on June 4, 2018, who recommended that his contact lenses be replaced. (*Id.* at 4). After failing to receive his contacts, he filed another healthcare appeal (SATF HC-18001512). (*Id.*). On January 14, 2019, Plaintiff still had not received his contact lenses and was assaulted by a cellmate.[1] (*Id.*).

Plaintiff's attachments show that his healthcare appeals were addressed by Defendants Cryer, Lewis, and Gates.

### B.    The Screening Order

The Court entered a screening order on November 7, 2019. (ECF No. 11). Based on the complaint's allegations, the Court concluded that Plaintiff sufficiently alleged that he had a

---

[1] While not relevant to the issues presented in this motion for summary judgment, Plaintiff had previously filed a request for "single cell status," stating that his vision problems, when he removed his contact lenses to sleep or rest his eyes, left him vulnerable to an attack from another inmate. (ECF No. 1, p. 9).

1    serious need for contact lenses and did not receive them, despite prison officials being aware of

2    that need. (*Id.* at 7). And the Court concluded that Plaintiff stated cognizable claims that

3    Defendants Cryer, Lewis, and Gates were deliberately indifferent to Plaintiff's serious medical

4    needs because each of these individuals was involved in the response to Plaintiff's healthcare

5    appeals. (*Id.* at 8). The Court found that the complaint did not state a deliberate-indifference claim

6    against any other Defendant that Plaintiff had named because he had not sufficiently alleged their

7    involvement with his medical treatment. (*Id.*). The Court also found cognizable a claim for failure

8    to protect against Defendant S. Smith relating to Plaintiff's allegation of being assaulted by a

9    cellmate. (*Id.*).

10            After Plaintiff filed a notice to proceed only on the cognizable claims, the Court entered

11    findings and recommendations to proceed only on those claims, which were adopted by the

12    district judge. (ECF Nos. 12, 14, 33). The Court later issued findings and recommendations

13    regarding a motion for summary judgment filed by Defendant Smith, recommending that

14    summary judgment be granted because Plaintiff failed to exhaust his administrative remedies as

15    to Defendant Smith. (ECF No. 63, *see* ECF No. 50). The district judge adopted the findings and

16    recommendations. (ECF No. 66). Thereafter, Defendants Cryer, Lewis, and Gates filed their

17    motion for summary judgment on the remaining claims that they were deliberately indifferent to

18    Plaintiff's serious medical needs. (ECF No. 65).

19            On August 19, 2021, Defendants filed a notice of errata, stating that defense counsel

20    inadvertently failed to include "deposition excerpts relied upon in Defendants' motion for

21    summary judgment." (ECF No. 69, p. 1). The notice attaches the relevant excerpts, represents that

22    Plaintiff already possesses a full copy of his deposition transcript, and asks that the Court

23    consider the excerpts as part of the record. (*Id.* at 2). The Court will consider the excerpts as part

24    of the record and concludes that it need not allow Plaintiff to file any supplemental response

25    given Defendants' representation that he possesses a full copy of his transcript.[2]

26    _____

27    [2] Defendants also included an amended statement of facts, stating that "[t]he only difference between the
     original separate statement and the amended statement is the inclusion of Plaintiff's deposition excerpts
     which match the citations in the separate statement." (ECF No. 69). Because there is no substantive

28    difference between the original and separate statement, the Court cites to the original statement (ECF No.

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   SUMMARY OF THE PARTIES' ARGUMENTS

Defendants argue that they were not deliberately indifferent to Plaintiff's serious medical needs for the following reasons:

> (1) Defendants' involvement in Plaintiff's claims were limited to the administrative review of appeals; (2) Defendants are not medical professionals and did not have the authority to contract with outside medical professionals or schedule appointments; (3) Plaintiff's treatment for his [keratoconus] was on-going throughout all times relevant to his lawsuit, and Defendants did not refuse treatment for Plaintiff.

(ECF No. 65, p. 1). Defendants also argue that they are entitled to qualified immunity because "there is no indication that Defendants' purely administrative review of Plaintiff's appeals violated clearly established law" and that "they could not violate Plaintiff's Constitutional rights for not performing actions that were not within their control." (ECF No. 65-1, p. 21, 23).

Plaintiff's opposition asserts that Defendants downplay their involvement in his medical care and states that they had the authority "to rule for or against intervention in medical treatment." (ECF No. 67, p. 2). And Plaintiff states that "[i]f this case goes to trial, [he] intends to prove that Defendants knew of delays in his medical treatment, knew that further delay would inevitably occur due to their 'no intervention' rulings and cause harm to [him] and still knowingly and deliberately decided not to intervene in their authority." (*Id.*).

Defendants' reply argues that Plaintiff has failed to submit any evidence creating a genuine issue of material fact and reiterates their arguments for granting summary judgment. (ECF No. 68).

### IV.   LEGAL STANDARDS

#### A.    Legal Standards for Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the

---

65-2) throughout these findings and recommendations.

4

1   record, including depositions, documents, electronically stored information, affidavits or

2   declarations, stipulations (including those made for purposes of the motion only), admissions,

3   interrogatory answers, or other materials, or showing that the materials cited do not establish the

4   absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

5   evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

6        A party moving for summary judgment "bears the initial responsibility of informing the

7   district court of the basis for its motion, and identifying those portions of 'the pleadings,

8   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

9   any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

10   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party

11   moves for summary judgment on the basis that a material fact lacks any proof, the Court must

12   determine whether a fair-minded jury could reasonably find for the non-moving party. *Anderson*

13   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in

14   support of the plaintiff's position will be insufficient; there must be evidence on which the jury

15   could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential

16   element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*,

17   477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying

18   solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040,

19   1045 (9th Cir. 1989).

20        In reviewing the evidence at the summary judgment stage, the Court "must draw all

21   reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros*

22   *de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). Additionally,

23   "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255.

24        In reviewing a summary judgment motion, the Court may consider other materials in the

25   record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v.*

26   *San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

27       **B.**    **Legal Standards for Undisputed Facts**

28        Under this Court's local rules, "[e]ach motion for summary judgment or summary

5

adjudication shall be accompanied by a 'Statement of Undisputed Facts' that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any . . . document relied upon to establish that fact." Local Rule 260(a). Further, responses to motions for summary judgment have certain requirements:

> Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any . . . document relied upon in support of that denial. . . . The opposing party shall be responsible for the filing of all evidentiary documents cited in the opposing papers.

Local Rule 260(b) (citation omitted). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Here, Plaintiff was provided with a *Rand* warning,[3] which informed him of the summary judgment requirements:

> When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule [56(c)], that contradict the facts shown in the defendant's declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial.

ECF No. 65-6, p. 2).

Plaintiff was also notified of Local Rule 260 and about how that Rule required Plaintiff to "reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." (*Id.* at 2) (quoting Local Rule 260(b)).

Despite this, Plaintiff has failed to reproduce Defendants' itemized statement of facts. Because of this failure, Defendants argue that their "motion, should, therefore, be granted." (ECF No. 68, p. 2).

---

[3] *See Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998).

6

However, Defendants are not entitled to summary judgment merely because Plaintiff failed to file a counter statement of facts. The Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Moreover, Defendants, as the moving party, still "ha[ve] both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If [Defendants] fail[] to carry [their] initial burden of production, the [Plaintiff] has no obligation to produce anything, even if [he] would have the ultimate burden of persuasion at trial." *Id.* at 1102-03.

In evaluating Defendants' motion for summary judgment, the Court has taken facts set forth in Defendants' statement of facts as undisputed.  However, the Court also notes that Plaintiff's complaint is verified, and thus may also be considered in determining the facts at issue to the extent that it sets forth facts within the Plaintiff's personal knowledge that are admissible into evidence. *See Jones v. Blanas*, 393 F.3d 918, 922–23 (9th Cir. 2004) (noting that because plaintiff was proceeding *pro se*, the Court was required to "consider as evidence in his opposition to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [he] attested under penalty of perjury that the contents of the motions or pleadings are true and correct").  Moreover, the Court has also evaluated facts set forth by Plaintiff as confirmed by the healthcare appeals, which are contained in the record. The Court has then evaluated whether these facts entitle Defendants to summary judgment using the applicable legal standards.

### C.    Deliberate Indifference to Serious Medical Needs

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition

1    could result in further significant injury or the unnecessary and wanton infliction of pain,'" and

2    (2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting

3    *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations

4    marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th

5    Cir. 1997) (*en banc*)). "This second prong—defendant's response to the need was deliberately

6    indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain

7    or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091,

8    1096 (9th Cir. 2006). Delay in medical treatment generally only constitutes deliberate

9    indifference if it causes further harm. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766

10   F.2d 404, 407 (9th Cir. 1985).

11   **V.    UNDISPUTED FACTS**

12          The Court finds the following facts material and undisputed for purposes of summary

13   judgment:

14          **A.    Defendant Cryer**

15          According to Plaintiff's verified complaint, he received contact lenses on October 4, 2016,

16   at Kern Valley State Prison. (ECF No. 1, p. 3). The lenses are to be replaced every 6 months.

17   (*Id.*). After Plaintiff transferred to SATF in December of 2016, he told SATF medical that his

18   lenses would need to be replaced. (*Id.*). Plaintiff was told that he would be referred to see an

19   ophthalmologist, but when this failed to happen, he filed healthcare appeal SATF HC-17065076

20   in June 2017. (*Id.*).

21          Defendant Cryer was formerly the Chief Executive Officer at SATF and provided the

22   initial response to both of Plaintiff's healthcare appeals. (ECF No. 65-3, pp. 1, 3, 4). For

23   healthcare appeal SATF HC-17065076, Plaintiff requested "to see optometry and

24   ophthalmology . . . to receive replacement lenses" and asked for a renewal of his contact lens

25   solution. (*Id.* at 10). Plaintiff stated that he had "informed medical at two separate doctor's

26   appointments that [he] need[ed] to use optometry because [his] contacts need[ed] to be replaced."

27   (*Id.* at 12).  As to the contact lens solution, Plaintiff stated that he had been receiving only one 4

28   oz bottle every two weeks instead of the two 4 oz bottles he was prescribed for every two weeks.

8

(*Id.*). And due to an apparent error by prison medical staff, his 12-month prescription ran out in

12 weeks. (*Id.*). Although he informed "medical" multiple times, he achieved "no positive

results." (*Id.*). Without the solution, Plaintiff stated that he was "subject to eye infections." (*Id.*).

In August 2017, Defendant Cryer responded to this healthcare appeal. (*Id.* at 6). The

response noted that Plaintiff had been interviewed by a health care appeals registered nurse

(HCARN) regarding his appeal. As for the referral to see optometry and ophthalmology,

Defendant Cryer noted as follows:

> Review of your record revealed that your Primary Care Provider (PCP) authored a
> CDCR 7243 Request for Service (RFS) on 4/27/2017 for referral to the
> ophthalmologist. Unfortunately the compliance date for 7/26/2017 appointment
> has since passed. The HCARN noted that the off-site schedulers would be
> contacted to inquire about the late appointment. During the interview you were
> explained that you would see the ophthalmologist who would then recommend you
> to the see the optometrist [a]s medically indicated.

(*Id.*). As for the contact lens solution, the HCARN learned that the solution was a drug request

that "was approved until June 2018" and Plaintiff "would need to request a refill through the

CDCR  7362 Health Care Services Request Form just as with other medications." (*Id.*). In

concluding, Defendant Cryer stated that the appeal was "partially granted in that you have a valid

order for contact lens solution, and a pending appointment with the ophthalmologist. Referral to

the optometrist is dependent on the recommendation of the ophthalmologist." (*Id.*).

Plaintiff was "transferred to Los Angles County Jail from approximately February 20,

2018, to May 15, 2018." (ECF No. 65-2, p. 2 – undisputed fact #4). "This transfer interrupted

referrals to outside care providers, but shortly after Plaintiff transferred back to SATF, his

Primary Care Physician started the referral process again for Plaintiff to see a keratoconus

specialist for new lenses." (*Id.* – undisputed fact #5).

Plaintiff's complaint states that he "finally [saw] an ophthalmologist on June 4, 2018, who

recommended contact lens replacement." (ECF No. 1, p. 4); (*see also* 65-2, p. 9 - undisputed fact

# 49) (noting that "Plaintiff had been seen by the ophthalmologist on June 4, 2018," with the

ophthalmologist stating "that Plaintiff needed to be seen by an optometrist that specializes in

contact lens fitting for keratoconus control, vision health, and visual function optimization").

However, after Plaintiff did not receive his lenses, he filed healthcare appeal SATF HC-

1    18001512. (ECF No. 1, p. 4).

2         For healthcare appeal SATF HC-18001512, which Plaintiff submitted in July 2018,

3    Plaintiff stated that he had seen a specialist in June 2018 and his contact lenses had been ordered;

4    however, he still had not received them. (*Id.* at 20). He requested that they be provided to him as

5    soon as possible. (*Id.*).

6         In September 2018, Defendant Cryer provided the response to this healthcare appeal. (*Id.*

7    at 22). The response noted that health care records revealed that Plaintiff was seen by an

8    ophthalmologist on June 4, 2018, who noted that Plaintiff "needed to be seen by an optometrist

9    that specializes in contact lens fitting for keratoconus control." (*Id.*).  Plaintiff saw his primary

10   care provider on June 6, 2018, and "referral to optometry [was] completed." (*Id.*). Moreover,

11   Plaintiff was "advised not to use old contact lenses." (*Id.*).

12        "[O]n 6/8/18, a routine request for services was submitted for ophthalmology for

13   keratoconus, keratopathy, dry eyes. The appointment is currently pending because the onsite

14   optometrist does not provide[] services for keratoconus. Your [primary care provider] was

15   contacted to initiate a referral for off-site optometry. The referral is pending." (*Id.* at 22-23).

16   Defendant Cryer's institutional level disposition checked a box for "no intervention," stating that

17   Plaintiff was "encouraged to continue [his] care with [his] assigned health care providers and

18   share with them new or additional clinical information about [his] conditions that [he] believe[d]

19   may affect [his] care." (*Id.*).

20        At an unspecified date in September 2018, which is around the time that Defendant Cryer

21   declined to intervene in Plaintiff's healthcare appeal SATF HC-18001512, "Plaintiff was

22   scheduled to see a specialist at Natural Vision, but the specialist could not see Plaintiff until the

23   specialized contacts they ordered for him arrived." (ECF No. 65-2, p. 2 – undisputed fact # 6).

24   Plaintiff saw the specialist at Natural Vision for his contacts "on or about October 22, 2018." (*Id.*

25   – undisputed fact # 7). Around March 14, 2019, Plaintiff saw someone at Natural Vision for a

26   fitting for his lenses. (*Id.* – undisputed fact # 8). "Plaintiff had multiple appointments with Natural

27   Vision throughout 2019, when they continued to try and find the right fitting contact lenses for his

28   particularized issues." (*Id.* at 3 – undisputed fact # 10). When Plaintiff received lenses that did not

fit him properly, Natural Vision still permitted Plaintiff to take the lenses back to SATF to try to wear them. (*Id.* – undisputed fact # 9). "Sometime between February and June 2020, Natural Vision was finally able to find a set of contacts that properly fit Plaintiff." (*Id.* – undisputed fact # 10).

In his declaration attached to the motion for summary judgment, Defendant Cryer addresses his role regarding healthcare appeals: "Appeals analysts [who worked under Defendant Cryer] reviewed appeals, then the appeals would come to me for secondary review. When appeals are elevated to my level, I check the response, as a second pair of administrative eyes, to make sure that the issue was addressed and the response completed within the applicable time frames." (ECF No. 65-3, p. 3). "I was not directly responsible for insuring timeliness for appointments or following up for medical appointments. Issues regarding medical services and delays were handled by the institution's contracting and scheduling staff and/or through CDCR headquarters." (*Id.*). He "was not authorized to contract with outside medical providers or schedule inmate appointments with outside medical providers." (*Id.*). "In cases where appointments are delayed, the appeals analysts preparing the decision would contact the scheduling and or contracts department as needed to ascertain status updates on contracts and appointments, but they likewise have no power to enter into contracts or schedule appointments." (*Id.* at 2). Further, he is "not a medical professional" and in responding to Plaintiff's appeals he "relied on the findings of the . . . primary care providers and other qualified treating medical professionals." (*Id.* at 2).

## B. Defendant Lewis

Defendant Lewis was formerly the Deputy Director of Policy Risk Management Services, which oversees the Health Care Correspondence and Appeals Branch. (ECF No. 65-4, p. 1). After Plaintiff appealed SATF HC-17065076 regarding his need for contact lens solution, replacement contact lenses, and medical consultation, Defendant Lewis provided the headquarters' level decision in December 2017. (*Id.* at 6). Defendant Lewis noted the following regarding Plaintiff's care since filing the healthcare appeal in June 2017:

On September 11, 2017, you were seen and evaluated by an optometrist. The optometrist noted that your lenses were in good condition and that there was no corneal or conjunctival inflammation.

On October 20, 2017, you were seen and evaluated by a primary care provider. The provider reviewed your diagnosis of keratoconus and noted that you would be referred for new contact lenses.

> Documentation indicates a referral to ophthalmology was approved on November 15, 2017, and is currently pending scheduling. If the appointment does not take place within the time frames outlined in Inmate Medical Services Policies and Procedures, Volume 4, Chapter 8, you may submit a CDC 7362, Health Care Services Request Form, to discuss your concern with health care staff.

You continue to be enrolled in the Chronic Care Program, and primary care provider follow-up is pending scheduling for the ongoing evaluation of your chronic health care concerns. Review of your pharmacy profile indicates you [] have an active order for contact lens solution.

(*Id.*). Defendant Lewis determined that "no intervention at the Headquarters' Level of Review is necessary as your medical condition has been evaluated and you are receiving treatment deemed medically necessary." (*Id.* at 7).

In her declaration attached to the motion for summary judgment, Defendant Lewis addresses her role regarding healthcare appeals:

> For appeals that were escalated to my direct review, I looked at the inmates' health records to verify that the information the inmates provided in their 602 HC appeals was accurate. Further, I looked at the inmates' medical records to verify that the information staff provided in the first and/or second level responses was accurate. At times, I would also review the applicable regulations and policies and procedures to verify that the decisions in the first and/or second level responses complied with the applicable regulations and policies and procedures. Staff service managers working under me pursuant to California Code of Regulations, title 15, section 3999.225(x)(4) also took similar steps in their administrative HC appeal review.

(*Id.* at 2). She "was not authorized to contract with outside medical providers or schedule inmate appointments with outside medical providers." (*Id.*). Nor was she "responsible for insuring timeliness for appointments or following up for medical appointments. Issues regarding medical services and delays were handled by the institution's contracting and scheduling staff and/or through CDCR headquarters." (*Id.* at 3). If "appointments are delayed, the staff service managers [who worked under her] (or above) preparing the CCHCS decision would contact the institution and headquarters as needed to ascertain status updates on contracts and appointments, but they

12

likewise have no power to enter into contracts or schedule appointments." (*Id.* at 2). Further, she

is "not a medical professional" and in responding to Plaintiff's appeal she "relied on the findings

of the . . . primary care providers and other qualified treating medical professionals." (*Id.*).

### C.    Defendant Gates

Defendant Gates is the Chief of the Health Care Correspondence and Appeals Branch.

(ECF No. 65-5, p. 1). After Plaintiff appealed healthcare appeal SATF HC-18001512 regarding

his need for contact lenses, Defendant Gates provided the headquarters' level decision in

December 2018. (*Id.* at 6). Defendant Gates noted the following regarding Plaintiff's medical care

since filing the healthcare appeal in July 2018:

> Records indicate you were seen by a primary care provider on September 4, 2018. The provider noted that you have not been seen by the optometrist for new contact lens. The provider documented that the routine referral was approved, but the appointment has not been made. You were informed that utilization management would reschedule you for an appointment.
>
> On October 22, 2018, you received ophthalmology consultation for contact lens fitting. On November 5, 2018, you received primary care provider follow-up. The provider noted you completed a fitting consultation with an ophthalmologist and that you were awaiting the delivery of your contact lenses. The provider documented you have already received ocular lubricants and lens solution. Subsequent to this appointment, there is no documentation that you have attempted to access health care services utilizing approved processes for concerns related to the issuance of contact lens. Review of your medication list indicates you have active orders for ocular lubricant eye drops and contact lens solution.

(*Id.* at 6-7).

Based on this information, Defendant Gates determined that "no intervention" was

necessary. (*Id.* at 6).

In her declaration attached to the motion for summary judgment, Defendant Gates

addresses her role in reviewing healthcare appeals:

> For grievances that were escalated to my direct review, I looked at the inmates' health records to verify that the information the inmate provided in their 602 HC grievance was accurate. Further, I looked at the inmates' medical records to verify that the information staff provided in the institutional level responses was accurate. At times, I would also review the applicable regulations and policies and procedures to verify that the decisions in the first and/or second level responses complied with the applicable regulations and policies and procedures. Staff service managers working under me pursuant to California Code of Regulations, title 15, section 3999.225(x)(4) also took similar steps in their administrative HC grievance review.

(*Id.* at 2). She "was not authorized to contract with outside medical providers or schedule inmate

13

1  appointments with outside medical providers." (*Id.*). Nor was she "responsible for insuring

2  timeliness for appointments or following up for medical appointments. Issues regarding medical

3  services and delays were handled by the contracting and scheduling staff at Plaintiff's institution

4  and/or through CDCR headquarters." (*Id.* at 3). If "appointments are delayed, the staff service

5  managers [who worked under her] (or above) preparing the CCHCS decision would contact the

6  institution and headquarters as needed to ascertain status updates on contracts and appointments,

7  but they likewise have no power to enter into contracts or schedule appointments." (*Id.* at 2).

8  Further, she is "not a medical professional" and in responding to Plaintiff's appeal she "relied on

9  the findings of the . . . primary care providers and other qualified treating medical professionals."

10  (*Id.*).

11  **VI.   ANALYSIS**

12         In light of these facts, the Court now considers Defendants' arguments for summary

13  judgment. Specifically, the Defendants argue that they could not be considered deliberately

14  indifferent to Plaintiff's serious medical needs because each of them was involved with Plaintiff's

15  claimed medical needs only to the extent that they reviewed his administrative appeals, they

16  lacked medical training and the authority to provide him with medical care, and they never denied

17  him medical care. (ECF No. 65, p. 1). The Court addresses each argument in turn.

18         **A.   Involvement in Plaintiff's Medical Care**

19         Defendants first argue that they are entitled to summary judgment because they were only

20  involved with Plaintiff's healthcare to the extent that they reviewed his healthcare appeals. (ECF

21  No. 65-1, pp. 15-16). As legal support, Defendants rely on the following cases: *Quinn v. Merritt*,

22  No. 1:18-cv-00547-DAD-BAM (PC), 2018 WL 3854017, at \*4 (E.D. Cal. Aug. 10, 2018); *Neale*

23  *v. Sherman*, No. 1:18-cv-00342-DAD-BAM (PC), 2019 WL 462763, at \*6 (E.D. Cal. Feb. 6,

24  2019), *report and recommendation adopted*, 2020 WL 1332843 (E.D. Cal. Mar. 23, 2020),

25  *appeal dismissed*, No. 20-16082, 2020 WL 5237314 (9th Cir. Aug. 24, 2020); *Battensby v.*

26  *Zhang*, No. 3:20-cv-0001-BAS-MDD, 2020 WL 2614856, at \*5 (S.D. Cal. May 22, 2020).

27         In *Quinn*, the court concluded that the plaintiff failed to state a claim for deliberate

28  indifference against Defendant Cryer because plaintiff received treatment in accordance with the

1   direction of a medical professional, and, although plaintiff and the medical professional had a

2   difference of opinion regarding the appropriate course of treatment, such difference of opinion

3   did not amount to deliberate indifference regarding the medical professional or Defendant Cryer,

4   who simply reviewed plaintiff's appeal regarding the medical professional's treatment of

5   plaintiff. *Quinn*, 2018 WL 3854017, at *3-4. Similarly, in *Neale*, the court concluded that the

6   plaintiff failed to state a claim for deliberate indifference against Defendants Cryer and Lewis in

7   their role in reviewing his healthcare appeals complaining about medical providers not providing

8   him the treatment that he thought was warranted.  *Neale*, 2019 WL 462763, at *3-4. Likewise, in

9   *Battensby*, the court dismissed a deliberate-indifference claim against Defendant Gates that was

10   premised only on her administrative review of a medical provider's decision to deny the plaintiff

11   medical care. *Battensby*, 2020 WL 2614856, at *2-5.

12          These cases are distinguishable from this case. While it is true that "inmates lack a

13   separate constitutional entitlement to a specific prison grievance procedure," *Ramirez v. Galaza*,

14   334 F.3d 850, 860 (9th Cir. 2003), the instant case does not involve the Defendants' failure to

15   overturn a medical provider's decision to deny treatment. Rather, as Plaintiff points out, medical

16   professionals had repeatedly concluded that Plaintiff needed medical treatment. (*See* ECF No. 67,

17   p. 3 (noting that Gates knew that Plaintiff had yet to see the optometrist for new contact lenses

18   and "still Gates admittedly contacted no one"). Defendants' liability is not premised on any

19   failure to reverse a medical decision, or indeed any medical decision at all.  Instead, as the Court

20   found in its screening order, "Plaintiff's complaint sufficiently alleges that he had a serious need

21   for contact lenses and did not receive them, despite prison officials being aware of that need."

22   (ECF No. 11, p. 7). In other words, Defendants' potential liability stems from their failure to take

23   any action when repeatedly told that the directions of medical providers were not being followed.

24          Importantly, "if there is an ongoing constitutional violation and the appeals coordinator

25   had the authority and opportunity to prevent the ongoing violation, a plaintiff may be able to

26   establish liability by alleging that the appeals coordinator knew about an impending violation and

27   failed to prevent it." *Herrera v. Hall*, No. 1:08-CV-01882-LJO, 2010 WL 2791586, at *4 (E.D.

28   Cal. July 14, 2010), *report and recommendation adopted*, 2010 WL 3430412 (E.D. Cal. Aug. 30,

1    2010).

2            Here, it is undisputed that Defendants knew that Plaintiff was not receiving medical care.

3    As to Defendant Cryer, he was aware from his review of healthcare appeal SATF HC-17065076,

4    which Plaintiff submitted in June 2017, that Plaintiff requested a renewal of his contact lens

5    solution "and to see optometry and ophthalmology . . . to receive replacement lenses." (ECF No.

6    65-3, p. 10). Regarding the contact lens solution, by the time that Defendant Cryer provided the

7    initial response to this appeal in August 2017, he knew that Plaintiff's appeal complained of

8    running out of the solution and not receiving any assistance to obtain more solution through

9    "medical." (*Id.* at 12). Defendant Cryer learned from the HCARN that the contacts lens solution

10   was in fact approved although Plaintiff was not receiving it. Although this appeal was "partially

11   granted," (*id.* at 6), Defendant Cryer actually took no action to ensure that Plaintiff received his

12   contacts lens solution and simply instructed Plaintiff to request a refill, although Plaintiff had

13   been requesting his contact lens solution from medical "with no positive results," which is what

14   led to the filing of the healthcare appeal, (*id.* at 12).

15           Likewise, Defendant Cryer knew that Plaintiff's primary care provider had referred him to

16   an ophthalmologist on April 17, 2017, but the compliance date of July 26, 2017, had already

17   expired. However, despite knowing that Plaintiff had had a referral to an ophthalmologist in April

18   2017, which had expired in July 2017, Defendant Cryer took no action to ensure that the

19   appointment occurred, instead observing that "the HCARN noted that the off-site schedulers

20   would be contacted to inquire about the late appointment." (*Id.* at 10).

21           From Defendant Cryer's review of healthcare appeal SATF HC-18001512, which Plaintiff

22   submitted in July 2018, he was aware that, in June 2018, an ophthalmologist had determined that

23   Plaintiff "need[ed] to be seen by an optometrist that specializes in contact lens fitting" and that

24   Plaintiff had been "advised not to use old contact lenses." (*Id.* at 22). Yet, Defendant Cryer failed

25   to intervene in September 2018 despite knowing that approximately three months before

26   rendering his decision that Plaintiff's medical provider directed him "not to use old contact

27   lenses." (*Id.* at 23). Rather than intervene, Defendant Cryer simply responded that an appointment

28   was pending for an off-site referral to optometry and checked a box for "no intervention," and

"encouraged [Plaintiff] to continue [his] care with [his] assigned health care providers and share

with them new or additional clinical information about [his] conditions that [he] believe[d] may

affect [his] care." (*Id.*).

As to Defendant Lewis, who denied Plaintiff's appeal of SATF HC-17065076 in

December 2017, she would have known from review of Defendant's Cryer decision of the history

of Plaintiff's delayed issuance of contacts lens solution and his delays in seeing an

ophthalmologist. (ECF No. 65-4, p. 6). Moreover, she noted that Plaintiff had since seen his

primary care provider in October 2017 and "would be referred for new contact lenses" and that a

referral to ophthalmology was approved in November 2017 but remained pending. (ECF No. 65-

4, p. 6). However, despite knowing of Plaintiff's general history of delays, that Plaintiff had been

referred for contact lenses approximately two months before her decision, and that Plaintiff had

not even been scheduled to see ophthalmology (which referral was made approximately a month

before her decision) Defendant Lewis determined that "no intervention at the Headquarters' Level

of Review is necessary as your medical condition has been evaluated and you are receiving

treatment deemed medically necessary." (*Id.* at 7).

As to Defendant Gates, who determined in December 2018 that "no intervention" was

needed in SATF HC-18001512 regarding Plaintiff's need for contact lenses, she would have

known from Defendant Cryer's decision of Plaintiff's history of delays concerning his contact

lenses. (ECF No. 65-5, p. 6). Notably, she would have known that, since June 4, 2018, an

ophthalmologist had determined that "Plaintiff needed to be seen by an optometrist that

specializes in contact lens fitting for keratoconus control, vision health, and visual function

optimization." (ECF No. 65-2 – undisputed fact # 49). Moreover, she specifically noted Plaintiff's

appointment with his primary healthcare provider in September 2018 and that Plaintiff had not

seen the optometrist for new contact lenses yet. (ECF No. 65-5, p. 6). And she knew that Plaintiff

had a fitting consultation with ophthalmology in October 2018 and that Plaintiff was awaiting the

delivery of his contact lenses.

However, despite knowing of the general history of delays with Plaintiff's medical care

and that a medical provider had determined that Plaintiff needed to be seen for a contact lens

1  fitting approximately six months beforehand and still had yet to receive his lenses, Defendant

2  Gates declined to intervene and in fact indicated that Plaintiff had not appropriately followed up

3  regarding his lenses: "Subsequent to [a November 2018 follow-up with Plaintiff's primary care

4  provider] there is no documentation that you have attempted to access health care services

5  utilizing approved processes for concerns related to the issuance of contact lens." (*Id.* at 6-7).

6      Accordingly, given Defendants' knowledge of delays in medical care that medical

7  providers had determined was necessary, Defendants' argument on this point does not warrant

8  summary judgment.

9      **B.    Medical Training and Authority to Intervene**

10     Defendants next argue that they lacked the medical training or the authority to intervene in

11  Plaintiff's medical treatment. (ECF No. 65-1, pp. 16-17). Plaintiff argues that Defendants place

12  all the "emphasis on the authority they don't have, yet little to none in acknowledging the

13  authority they do have, which is to rule for or against intervention in medical treatment." (ECF

14  No. 67, pp. 1-2).

15     Defendants' declarations focus on their lack of medical training and the lack of their

16  authority to contract with outside medical providers or schedule inmate appointments. However,

17  they do not disclaim any ability to do anything at all to facilitate Plaintiff's medical care. For

18  example, they do not disclaim the ability to contact someone who does schedule appointments to

19  ensure that they are handling the scheduling.  As to Defendant Cryer, he reviewed appeals as "a

20  second pair of administrative eyes" after they went to appeals analysists that worked under him.

21  (ECF No. 65-3, p. 3). When delays occurred, the analyst who prepared the decision was able to

22  "contact the scheduling and or contracts department as needed to ascertain status updates on

23  contract and appointments." (*Id.* at 2). Likewise, with Defendants Lewis and Gates, when delays

24  occurred, staff services managers working under them would contact the institution and

25  headquarters as needed to ascertain status updates on contracts and appointments. (ECF No. 65-4,

26  p. 2; 65-5, p. 2). Moreover, Defendants' ability to take some action is supported by the healthcare

27  appeals themselves, which allowed the Defendants to intervene. (*See* ECF No. 65-3, pp. 6, 16).

28  ///

18

1    Nor do they disclaim the ability to investigate, at the administrative level, why Plaintiff

2    was experiencing multiple delays. Fittingly, the Supreme Court's has noted that the purpose of

3    requiring exhaustion through internal prison appeals, like those filed by Plaintiff, is because

4    "corrective action taken in response to an inmate's grievance might improve prison

5    administration and satisfy the inmate, thereby obviating the need for litigation." *Porter v. Nussle*,

6    534 U.S. 516, 525 (2002). However, in this case, Defendants took no action to improve prison

7    administration of Plaintiff's healthcare appeals; rather, they simply continued to decline to

8    intervene in any manner despite knowing of delays in Plaintiff receiving medical care.

9    The Court notes that Defendants also argue that Natural Vision, an outside provider, was

10   responsible for delays: "Plaintiff's care and the timeliness of his care was at the hands of the

11   outside provider – Natural Vision. Plaintiff can offer no evidence that Defendants had any

12   authority to order, manufacture, or ship his specialty contacts. This was all in Natural Visions'

13   hands." (ECF No. 65-1, p. 19). At the outset, the undisputed facts concerning the delays from

14   Natural Vision never explain the specific cause behind the delays in Plaintiff receiving properly

15   fitting lenses. (*See* ECF NO. 65-2, p. 2-3 – undisputed facts # 6-11). Defendants provide no

16   declaration or similar evidence of anyone from Natural Vision identifying the underlying cause of

17   the delays. Rather, Defendants cite to Plaintiff's deposition, and his understanding of the care he

18   obtained through Natural Vision. Delay in Natural Vision's care does not lead to the conclusion

19   that Defendants could not have done anything to facilitate more timely care.

20   Regardless of the cause of the delays, however, the record indicates that most Natural

21   Vision's involvement, and resulting delay, occurred after Defendants' involvement with

22   Plaintiff's healthcare appeals ended. For example, Defendants allege (again, based on Plaintiff's

23   deposition testimony) "[i]n September 2018, Plaintiff was scheduled to see a specialist at Natural

24   Vision, but the specialist could not see Plaintiff until the specialized contacts they ordered for him

25   arrived." (ECF No. 65-2, p. 2 – undisputed fact # 6). Plaintiff then saw a specialist at Natural

26   Vision in October 22, 2018, concerning his contact lenses. (*Id.* at undisputed fact # 7). However,

27   by September and October 2018, Defendant Cryer no longer had any involvement with Plaintiff's

28   first healthcare appeal and in September 2018 he issued the decision declining to intervene in

19

1   Plaintiff's second healthcare appeal, ending his involvement with Plaintiff's medical care.

2   Likewise, Defendant Lewis had no involvement during this time frame, as she issued her decision

3   in December 2017.

4          While Defendant Gates was aware of some delays by Natural Vision by the time she

5   reviewed Plaintiff's second healthcare appeal in December 2018, as noted above, she also knew

6   of a history of delays in Plaintiff's medical care, absent involvement by Natural Vision, going

7   back to Plaintiff's first appeal in June 2017. Further, most of the delays involving Natural Vision

8   occurred after Defendant Gates' involvement, with Natural Vision seeing Plaintiff for a fitting in

9   March 2019, multiple other appointments occurring in 2019, and issuing lenses that fit finally

10  being sometime between February and June 2020. (*Id.* at undisputed facts # 8, 10, 11).

11         Moreover, as discussed, there remains a genuine issue of material fact regarding whether

12  Defendants, including Gates, had the authority to facilitate the process of Plaintiff obtaining his

13  contact lenses. Thus, even if Natural Vision was responsible for some delays, the Court concludes

14  that there remains a genuine dispute of material fact as to whether Defendant Gates could have

15  taken steps to ensure that Plaintiff received prompt care, for example, by directing staff working

16  under her to follow up on the status of Plaintiff receiving his contact lenses.

17         Drawing all reasonable inferences in Plaintiff's favor, while neither the Defendants nor

18  employees working under them had the authority to contract for medical services or directly

19  schedule them, there remains a genuine issue of material fact as to whether Defendants could

20  have taken any steps to ensure that Plaintiff's medical treatment was not unnecessarily delayed,

21  for example, by directing staff workers to follow up on the status of Plaintiff's medical care.

22  Moreover, although none of the Defendants are medically trained, that ultimately is not

23  dispositive here because Defendants were informed by medical providers that Plaintiff needed

24  treatment and yet did not take any steps to intervene in his delayed care. Accordingly,

25  Defendants' argument on this point does not warrant summary judgment.

26         **C.      Delay in Medical Care**

27         Lastly, Defendants argue that they cannot be considered deliberately indifferent to

28  Plaintiff's serious medical needs because they never denied him care; his care was merely

pending, albeit delayed, when they acted on his healthcare appeals. (ECF No. 65-1, pp. 17-20).

Plaintiff counters that the extensive delays in his treatment creates a genuine issue of material fact

as to whether Defendants were deliberately indifferent to his medical needs. (ECF No. 67, p. 5

("Cryer was aware of extensive delays in Plaintiff's prescribed medical treatment and still called

no one and decided (in his authority) that no intervention was necessary.")

Here, the undisputed facts establish that Defendants knew of past delays and failed to take

action to prevent future delays. *See Estelle*, 429 U.S. at 104-05 (noting that deliberate indifference

may be manifested by "delaying access to medical care"). For example, when Cryer initially

reviewed healthcare appeal SATF HC-17065076 in August 2017, he knew that Plaintiff's primary

care provider had referred Plaintiff to an ophthalmologist in April 2017, that "the compliance date

for 7/26/2017 appointment had since passed," and that the HCARN had noted that off-site

schedulers would be contacted to inquire about the late appointment. (ECF No. 65-3, p. 6). While

the appointment to see the ophthalmologist was indeed pending, there is no indication that Cryer

followed up himself to ensure that Plaintiff's medical consultation occurred after "the compliance

date" had already expired once with Plaintiff not getting medical care.

Likewise, by the time that Defendant Lewis reviewed this appeal in December 2017, the

ophthalmology appointment was still pending scheduling. Lewis, however, declined to intervene,

instead simply telling Plaintiff that "[i]f the appointment does not take place within the time

frames outlined in Inmate Medical Services Policies and Procedures, Volume 4, Chapter 8, you

may submit a CDC 7362, Health Care Services Request Form, to discuss your concern with

health care staff." (ECF No. 65-4, p. 6). Notably, it does not appear that Plaintiff saw an

ophthalmologist until June 4, 2018, more than six months later. (ECF No. 65-2, p. 9 (undisputed

fact # 49)).

Additionally, in December 2018, when Defendant Gates was reviewing Plaintiff's appeal

of SATF HC-18001512, filed in July 2018, regarding the need for contact lenses, Defendant

Gates noted that, by November 2018, Plaintiff had since "received ophthalmology consultation

for contact lens fitting" and met with his primary care provider for a follow-up, with the provider

noting that Plaintiff was "awaiting the delivery of [his] contact lenses." (ECF No. 65-5, p. 6).

1   Although Defendants point to a delay by Natural Vision regarding the fitting of the lenses,

2   Natural Vision did not see Plaintiff until October 22, 2018. Moreover, there is no evidence that

3   Defendant Gates attempted in any way to accelerate Natural Vision's fitting of the contact lenses.

4        Finally, Defendants briefly assert that they cannot be considered deliberately indifferent to

5   Plaintiff's medical needs because he failed to show that he was harmed by the delays: "Plaintiff

6   has not provided any evidence to support that his [keratoconus] worsened, or that his vision

7   worsened in any way, due to any delays in the receipt of his new contacts." (ECF No. 68, p. 8).

8   However, at this stage of the proceedings, even without evidence that Plaintiff's keratoconus

9   worsened, it is sufficient that Plaintiff suffered "an unnecessary continuation of his condition" to

10  raise a genuine issue of material fact on this issue. *McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th

11  Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.

12  1997). Notably, Plaintiff's complaint states that "without these contact lenses, [his] natural vision

13  is 20/200 in the left eye and 20/400 in the right eye." (ECF No. 1, p. 3). Thus, regardless of the

14  effect on his keratoconus, there is sufficient evidence that his vision was impaired without the

15  contact lenses. Accordingly, Defendants' argument on this point does not warrant summary

16  judgment.

17        **D.    Qualified Immunity**

18        Lastly, the Defendants argue that they are entitled to qualified immunity. (ECF No. 65-1,

19  p. 20-23). Government officials enjoy qualified immunity from civil damages unless their

20  conduct violates "clearly established statutory or constitutional rights of which a reasonable

21  person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

22  *Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—

23  the need to hold public officials accountable when they exercise power irresponsibly and the need

24  to shield officials from harassment, distraction, and liability when they perform their duties

25  reasonably." *Pearson*, 555 U.S. at 231.

26        In determining whether an officer is entitled to qualified immunity, the Court must decide

27  (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and

28  (2) whether that right was clearly established at the time of the officer's alleged misconduct.

1   *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts are

2   "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

3   immunity analysis should be addressed first in light of the circumstances in the particular case at

4   hand." *Pearson*, 555 U.S. at 236. In resolving these issues, the Court must view the evidence in

5   the light most favorable to the plaintiff and resolve all material factual disputes in favor of the

6   plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

7        As set forth above, the Court has found that the evidence, taken in the light most favorable

8   to Plaintiff, presents genuine issues of material fact regarding whether Defendants were

9   deliberately indifferent to his medical needs. Therefore, the Court will turn to whether the right at

10   issue was clearly established at the time of the Defendants' alleged misconduct, which began in

11   2017. On this point, Defendants argue that "there is no indication that Defendants' purely

12   administrative review of Plaintiff's appeals violated clearly established law" and say that the case

13   law is, in fact, "contrary to this position." (ECF No. 65-1, p. 21). In support, Defendants cite

14   *Quinn*, *Neal*, and *Battensby*, the same cases that the Court earlier found to be factually distinct

15   from the circumstances of the present case because Defendants did not simply affirm a medical

16   provider's decision to deny care; rather, they knew from medical providers that Plaintiff needed

17   care. In summary, Defendants' argument amounts again to the contention that "they could not

18   violate Plaintiff's Constitutional rights for not performing actions that were not within their

19   control." (*Id.* at 23). However, as described above, there is a dispute of fact regarding whether

20   Defendants could have taken actions within their control to address Plaintiff's serious medical

21   needs.

22        Defendants also cite to *Mann v. Adams*, 855 F.2d 639 (9th Cir. 1988) but make no specific

23   argument about how this case applies in the clearly-established context. (ECF No. 65-1, p. 21).

24   Presumably, Defendants cite this case for the same proposition that it is cited earlier in their

25   motion for summary judgment in discussing the merits of Plaintiff's claim: "The existence of an

26   inmate appeals process does not create a protected liberty interest upon which Plaintiff may base

27   a claim that he was denied a particular result or that the appeals process was deficient." (*Id.* at

28   15). However, Plaintiff is not claiming a liberty interest in the prison grievance process; for

23

1    example, he does not assert a claim based on the Defendants' failure to process his grievances.

2    Rather, his claim is that Defendants were deliberate deliberately indifference to his serious

3    medical needs by declining to intervene to help him obtain medical care that was repeatedly

4    delayed.

5           In support of qualified immunity, Defendants rely on a district court case from 2012,

6    *Pogue v. Igbinosa*, which surveyed district court opinions at that time and concluded:

> The emerging consensus, therefore, is that a medically-trained official who
> reviews and denies an appeal is liable under the Eighth Amendment when a
> plaintiff can show that the official knew, at least in part, from reading the appeal
> that the plaintiff had a serious medical issue and nevertheless chose not to offer
> treatment. . . . Plaintiff cites no court within the circuit, however, that has extended
> this liability to non-medical prison staff tasked with reviewing appeals. Instead,
> non-medical reviewers who confirm that a prisoner is receiving some medical
> treatment "will generally be justified in believing that the prisoner is in capable
> hands."

12   2012 WL 603230, at *8-9; (ECF No. 65-1, p. 21) (internal citations omitted).  Certainly, many

13   district courts after that date have extended liability to reviewers of healthcare appeals who learn

14   of an unconstitutional condition that can be remedied and yet take no action.  *See, e.g., Govea v.

15   Lee*, No. CV 20-5443-JFW (KS), 2020 WL 6083436, at *4 n.3 (C.D. Cal. July 1, 2020) ("The

16   Court acknowledges that some district courts have found that a grievance appeal reviewer who

17   fails to remedy an ongoing denial of adequate medical care personally participates in an Eighth

18   Amendment violation."); *Sosa v. Foulk*, No. 2:14-cv-0727 DB P, 2020 WL 1820736, at *8 (E.D.

19   Cal. Apr. 10, 2020) ("[T]he court presumes that defendant Cornelison's rejection of plaintiff's

20   appeal was substantive in nature and that at minimum, review of the appeal put him on notice

21   with respect to plaintiff's assertions that his personal safety was at risk. These facts would make

22   this claim against defendant Cornelison cognizable at this stage in the proceedings."); *Norsworthy

23   v. Beard,* No. 14-cv-00695JST, 2015 WL 1478264, at *7-9 (N.D. Cal. March 31, 2015) (finding

24   that the plaintiff stated a valid claim for deliberate indifference against administrators who

25   reviewed and denied the plaintiff's grievance reports requesting sex reassignment

26   surgery); *Nicholson v. Finander*, No. CV 12–9993–FMO (JEM), 2014 WL 1407828, at *7 (C.D.

27   Cal. Apr. 11, 2014) ("[A] supervisor who learns about an unconstitutional denial of adequate

28

24

medical care from a prisoner's grievance and fails to intervene may be found to have personally participated in the Eighth Amendment violation."); *Johnson v. Valdez,* No. 1:11-cv-00053–BLW, 2013 WL 4494992, at *6 (D. Idaho Aug.16, 2013) (finding that the plaintiff stated a valid claim against administrators who failed to "rectify the delays" in his medical).  Moreover, the Supreme Court recognized in 1976 in *Estelle* that delays in medical treatment may manifest deliberate indifference:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 104–05 (internal citation omitted).  Notably, the Court in *Estelle* recognizes that "prison guards," who one would expect often not to be medically trained, can be held liable for healthcare delays.

In any event, the dispute of fact here concerns whether defendants truly concluded that the "prisoner is receiving some medical treatment," and "is in capable hands," in light of the repeated delays. Based on the foregoing, it was clearly established in 2017 that Defendants could be liable for deliberate indifference to serious medical needs if they meet the standards for that claim, regardless of whether their involvement came through the administrative exhaustion process. Therefore, the Court recommends finding that Defendants are not entitled to qualified immunity.

## VII.     CONCLUSION AND RECOMMENDATION

For the above reasons, there remains a genuine dispute of material fact and Defendants are not entitled to judgment as a matter of law.

Accordingly, IT IS RECOMMENDED that the motion for summary judgment (ECF No. 65) filed by Defendants C. Cryer, J. Lewis, and S. Gates be denied;

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written

objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 31, 2021**                    /s/ *Erica P. Grosjean*

UNITED STATES MAGISTRATE JUDGE